KEVIN V. RYAN (CSBN 118321)
United States Attorney
CHARLES O'CONNOR (CSBN 56320)
Assistant U.S. Attorney
450 Golden Gate Avenue
San Francisco, CA 94102-3489
Telephone: (415) 436-7200
Facsimile (415) 436-6748

Attorneys for United States

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| SWORDS TO PLOWSHARES, | ) | No. C 05-01661 MJJ |
| | ) | |
| Plaintiff, | ) | UNITED STATES OF AMERICA'S |
| | ) | *AMICUS CURIAE* MEMORANDUM |
| v. | ) | OF POINTS AND AUTHORITIES |
| | ) | RE MOTION FOR REMAND |
| ROBERT KEMP, | ) | |
| | ) | Hearing Date:  July 12, 2005 |
| Defendant. | ) | Time:          9:30 a.m. |
| | ) | |

## INTRODUCTION

This case involves a landlord-tenant dispute between two private parties.  Swords to Plowshares ("Swords") is a lessee and Robert Kemp ("Kemp") is Swords' sub-lessee in a building located within the borders of the Presidio of San Francisco, California ("Presidio").  Swords' lessor is the Presidio Trust ("the Trust"), a wholly owned U.S. government corporation responsible for the administration of the interior portion of the Presidio, including that portion of the Presidio where two buildings leased by Swords are located.  The Presidio Trust is not a party to this action, but has petitioned the Court to allow it to file this amicus curiae memorandum regarding exclusive federal jurisdiction at the Presidio.

Swords originally filed this unlawful detainer action against Kemp, its sub-tenant, in the Superior Court of California for the City and County of San Francisco.  On or about April 21, 2005, Kemp filed a Notice of Removal, and the case was filed in this Court.  Thereafter,

1   Swords moved to remand the case to California Superior Court and noticed its motion for

2   hearing on June 28, 2005.  The parties have now submitted their respective papers and legal

3   memoranda in connection with the motion for remand.  Some of the issues discussed in the

4   parties' legal memoranda concern the nature of federal jurisdiction over the Presidio.  In

5   particular, the plaintiff Swords contends that the exclusive jurisdiction of the United States

6   terminated when the  administration of the Presidio was transferred from the Secretary of the

7   Army to the Department of Interior and then to the Trust.  *See* Swords' Memorandum of

8   Points and Authorities in Support of Plaintiff's Motion to Remand ("Opening Memo") at

9   pp.6-12 and Swords' Reply Brief in Support of Motion to Remand ("Reply Memo"), at pp. 3-

10  12.

        Swords' arguments and conclusions are unfounded in law or logic.  Were they to be

12  adopted by the Court, the result would be severe damage to the Trust's interests and its ability

13  to fulfill its purpose and achieve the goals for which Congress created it.  To avoid such a

14  ruling, and to protect the interests of the Trust and the U.S. Department of the Interior

15  ("DOI"), which administers the coastal portions of the Presidio, the United States determined

16  that it was in its best interests to offer its views on the exclusive jurisdiction it exercises over

17  the Presidio.

18      On June 23, 2005, the United States indicated its intent to seek permission to file an

19  *amicus curiae* brief regarding the exclusive jurisdiction of the United States as to the Presidio

20  of San Francisco on behalf of the Presidio Trust and the U.S. Department of Interior.  The

21  Court thereafter issued an order continuing the hearing on the motion for remand until July 12,

22  2005 and requiring the United States to file its *amicus curiae* brief on or before July 8, 2005.

23                                    **BACKGROUND**

24      The key to answering the questions raised by plaintiff Swords' arguments regarding

25  exclusive federal jurisdiction is the origin and history of the United States' ownership of the

26  Presidio.

27

28  U.S.A.'s *Amicus Curiae* Memo
    Swords, etc. v. Kemp, C 05-01661 MJJ      - 2 -

The Presidio originally was ceded by the Republic of Mexico to the United States in 1848 by the Treaty of Guadalupe Hidalgo (9 Stat. 922).  *See also Standard Oil Co. v. California*, 291 U.S. 242, 243 (1934).  Upon admission of California into the Union in 1850 (9 Stat. 452), the land became part of the State, without reservation of jurisdiction, with proprietary ownership retained by the United States.  *United States v. Watkins,* 22 F.2d 437, 438 (1927).  An Executive Order of Nov. 6, 1850 dedicated the Presidio to public purposes, and California later ceded exclusive jurisdiction to the federal government, reserving only the right to serve and execute civil and criminal process.[1]/  Act of March 2, 1897, St. Cal. 1897, p. 51.  Indeed, in 1934, the Supreme Court held that upon cession the State of California "surrendered every possible claim of right to exercise legislative authority" within the Presidio.  *Standard Oil Co. v. California*, 291 U.S., at 244.

The Presidio was deactivated as a military post in 1994, and transfer of the administration from the Army to the U.S. Department of the Interior occurred that year.  Congress created the Presidio Trust in 1996 as a wholly-owned U.S. Government corporation to manage the developed portions of the Presidio (16 U.S.C. § 460bb Appendix (as amended)).  The balance of the Presidio lands, lying immediately adjacent to the Pacific Ocean and the San Francisco Bay, is administered by the U.S. Department of the Interior, National Park Service.  These points are not without significance, and the parties to this lawsuit, especially defendant Kemp, exhibit some confusion and misunderstanding as to the federal entities charged with administering the Presidio land.[2]/  Regardless of the identity of the specific federal entities

---

[1]    Three minor parcels were acquired by purchase in 1915, 1922, and 1923, at which time exclusive jurisdiction over those parcels also vested in the United States.  U.S. Const. art. I, §8, cl.17; §34, Political Code of California (now found, in part, in §§ 110-127 of the Government Code).

[2]/    For examples, see Defendant Robert Kemp's Opposition to Plaintiff's Motion to Remand at 10:20-21 ("Presidio 'in its entirety' falls under the jurisdiction of the National Park Service, a subdivision of the Department of Interior"); 11:21-22 (". . . the Department of Interior specifically promulgated a regulation"); 12:20-21 ("[the Presidio] is fully policed and regulated by the National

1   now administering the land, the Presidio has remained under the ownership of the United

2   States since 1848 and exclusive jurisdiction of the United States since at least 1897.

3                          **INTEREST OF THE UNITED STATES**

4          This memorandum is offered in support of continued exclusive federal jurisdiction

5   over the entire Presidio and in opposition to any argument that the United States lost its

6   exclusive jurisdiction over the Presidio upon transfer to the Trust and the National Park

7   Service or any other action or omission alleged by the parties to this action.  Nothing in this

8   memorandum is intended or should be construed as support or opposition to the position or the

9   interests of either party in this matter.  The United States takes no position as to the relative

10  merits of either party's case and does not urge the Court to find for one party or the other on

11  the merits.  It does, however, oppose the argument of either party and any finding by the Court

12  in this action that the United States has lost exclusive jurisdiction over any part of the Presidio.

13  The United States also suggests that the motion for remand can and should be decided on

14  grounds other than those dealing with the status of exclusive jurisdiction of the United States

15  on the Presidio.

16                                    **ARGUMENT**

17  **A.     Swords' Arguments Regarding the Loss of Exclusive Federal Jurisdiction are
            Unsupported by Facts or Law.**

18

19         The foundation of Swords' argument that the United States does not have exclusive

20  federal jurisdiction at the Presidio is twofold:  First, California's 1897 cession of exclusive

21  jurisdiction over the Presidio to the United States was conditioned upon the continued use of

22  the land for specific limited military / defense purposes, Opening Memo, 7:5-6 and; Second,

23

24  _____

25  Park Service").  These statements are either wholly or partially erroneous.  The facts are that the
    Trust is a government corporation which operates independently from both the DOI and NPS; the

26  regulations cited by Kemp were promulgated by the Trust, in its own right, not DOI; and, the NPS
    does not regulate any part of the developed areas on the Presidio, administered by the Trust.

27

28  U.S.A.'s *Amicus Curiae Memo*
    <u>Swords, etc. v. Kemp</u>, C 05-01661 MJJ     - 4 -

the transfer of administrative control of the Presidio from the Army, first to the DOI and then to Trust and NPS, terminated the exclusive jurisdiction previously granted by California, *Id.*, 7:15 to 8:8.  Neither of these is supported by the facts nor the law supplied by Swords, and both remain theory and speculation by Swords.[3]/

Contrary to Swords' assertion, the language in the 1897 cession act limiting it to "lands . . . now held, occupied, or reserved . . . for military purposes or defense . . . ." was not meant to be a condition subsequent on the cession of jurisdiction.  Opening Memo, at 7.  Instead the language was simply meant to identify the property over which jurisdiction was being ceded.

That identification was necessary because of a legislative gap left open by a previous cession of jurisdiction.  California's oldest cession act still in force was passed in 1872.  It provided, in part:

> The sovereignty and jurisdiction of this State extend to all places within its boundaries as established by the Constitution; but the extent of such jurisdiction over places that have been or may be ceded to, purchased or condemned by the United States, is qualified by the terms of such cession or the laws under which such purchase or condemnation has been or may be made.

Pol. Code Cal. § 33 (emphasis added).  The 1872 act ceded jurisdiction to all lands purchased and condemned by the United States.  However, it became apparent in *United States v. Bateman*, that the 1872 statute did not provide for exclusive jurisdiction over a military reservation, such as the Presidio, because it had not been "purchased or condemned."  *United States v. Bateman*, 34 F. 86, 90 (C.C.N.D.Cal. 1888).  After the *Bateman* case the legislature //

_____

3    "Any subsequent change of the use of the ceded land by the United States necessarily revoked  the jurisdiction conferred by the California legislation." (7:16-18) "By this change in the administrative authority over the land upon which the Veterans Academy sits, exclusive federal enclave jurisdiction under Clause 17 ended." (8:6-8).  Both conclusions are bereft of any citation  to supporting facts or legal authority.  They amount to bald theory and conjecture, only.

U.S.A.'s *Amicus Curiae Memo*
Swords, etc. v. Kemp, C 05-01661 MJJ     - 5 -

1  filled this gap left in previous statutes by ceding exclusive federal jurisdiction over reserved

2  military bases like the Presidio:

3       The state of California hereby cedes to the United States of America exclusive
         jurisdiction over all lands within this state now held, occupied, or reserved by the
4        government of the United States for military purposes or defense . . . .

5  Cal. Stat. 1897, p. 51.  This statute remedied the problem identified in *Bateman*, and established

6  exclusive federal jurisdiction over the Presidio.  The statute was upheld by subsequent case-law.

7  *See e.g., United States v. Watkins*, 22 F.3d 437 (N.D.Cal. 1927).

8       In the same session, the 1897 legislature passed a companion bill that granted title to

9  the tidelands adjacent to federal reservations, such as the Presidio.  It provided in part:

10       All the right and title of the State of California in and to the parcels of land extended
         from high-water mark out to three hundred yards beyond low-water mark, lying adjacent
11       and contiguous to such lands of the United States in this State . . . are hereby granted,
         released and ceded to the United States . . . [p]rovided, [t]hat the title to each parcel . . .
12       shall be and remain in the United States only so long as the United States shall continue
         to hold and own the adjacent lands now belonging to the United States.
13

14  Calif. Stat. 1897, p. 74 (emphasis added).  It is important to note that in this companion bill the

15  legislature did include an explicit reverter clause for the tidelands.  This demonstrates, *inter

16  alia*, that the California legislature well knew *how* to make a cession law subject to condition

17  subsequent and effectuate a reverter.  However, the clause in this instance was conditioned on

18  the United States continuing to "hold and own" the adjacent lands.  It was not conditioned on

19  the United States continuing to use them for "military or defense purposes."

20       When viewed in the light of its legislative history, the purpose of the limiting language

21  in the 1897 cession act was not meant to be an implied reverter or retrocession provision.  It

22  was meant to fill a legislative gap left by the 1872 Act by identifying the affected lands, and

23  establish exclusive jurisdiction over lands reserved for the military that were acquired by

24  means other than purchase or condemnation.  If the California lawmakers had wanted the

25  Presidio cession  to contain a reverter provision, they would not have couched it in an implied

26  "condition subsequent," as Swords' argument suggests.  Instead, the legislature would have

27  //

28  U.S.A.'s *Amicus Curiae* Memo
    Swords, etc. v. Kemp, C 05-01661 MJJ     - 6 -

1   made the reverter or retrocession condition explicit, just as they did for the companion bill on

2   tidelands.

3          Moreover, it would make no sense for exclusive jurisdiction over the Presidio to

4   retrocede upon transfer to a non-military or non-defense use, while the tidelands would only

5   retrocede when the United States ceases to "hold and own the adjacent lands."  Under Swords'

6   theory, when the United States transferred the Presidio to a federal non-military use it would

7   cease to have exclusive jurisdiction over the Presidio, but would continue to assert exclusive

8   jurisdiction over the adjacent tidelands because the United States still holds and owns the

9   Presidio, i.e., the adjacent lands.  Surely, the California legislature did not intend such a strange

10  result, and the Court should not accept Swords' fanciful interpretation of the meaning of the

11  1897 statute.

12          Two other lines of argument further rebut Swords' proposed reading of the cession to

13  have been conditional.  First, implied rights of reverter of the sort proposed by Swords are

14  highly disfavored in property law. In *Cullen v. J.C. Sprigg*, 83 Cal 56 (1890), the California

15  Supreme Court quoted from Washburn on Real Property:  "An estate upon condition cannot be

16  created by deed except when the terms of the grant will admit of no other reasonable

17  interpretation."  It also held that "contracts and laws declaring a forfeiture must be strictly

18  construed, and a forfeiture can never take place by implication, but must be effected by

19  express, unambiguous language."  See also, *Fitzgerald v. Modoc*, 164 C. 493, 495 ((1913).

20          In addition, another California case, *Behlow v. Southern Pacific Railroad*, 130 Cal 16

21  (1900), cites to California Civil Code section 1442, which is still in effect, and says

22  "[f]orfeitures are not favored in law, and conditions providing for the forfeiture of an estate are

23  to be construed liberally in favor of the holder of the estate and strictly against an enforcement

24  of the forfeiture."  See also, *Beran v. Harris*, 91 C.A.2d 562, 565 (1949) ("Property to be used

25  for residence and service station purposes, only" held <u>not</u> a condition subsequent). Only the

26  //

27

28   U.S.A.'s *Amicus Curiae* Memo
     <u>Swords, etc. v. Kemp</u>, C 05-01661 MJJ     - 7 -

1   most constrained reading of the 1897 cession statute would admit of even the possibility

2   pronounced by Swords and as such, it cannot be recognized by this Court.

3          Second, the State of California, by law, must affirmatively accept a cession or

4   retrocession of jurisdiction through a procedure involving a written request from the United

5   States, public notice, public hearings, and formal acceptance by the State.[4]/  Cal. Gov't Code

6   § 113.  No such procedures have taken place with respect to the Presidio, rendering it

7   impossible to conclude that the Presidio is under anything but the exclusive federal jurisdiction

8   granted to the federal government in 1897.

9

**B.     Swords Misconstrues the Authorizing Legislation for the Trust and Infers a
10           Totally Erroneous Congressional Intent in an Attempt to Support Its Theory.**

11         Section 104(h) of the authorizing legislation for the Trust provides as follows: "The

12  District Court for the Northern District of California shall have exclusive jurisdiction over any

13  suit filed against the Trust."  Publ. L. 104-33, Title I, 16 U.S.C. § 460bb appendix.  According

14  to Swords, this venue provision was intended by Congress to grant "both the Presidio Trust and

15  its tenants (like Swords to Plowshares) the right to pursue affirmative relief in state court."

16

17

18  ───────────────────

[4]/     It must also be noted that California's detailed procedural requirements for retrocession of
19  jurisdiction militate against any interpretation of the subject cession law which would include an
    implied reverter and severely undercut Swords' argument, to that effect.  Swords' interpretation of
20  the cession statute as creating an implied reverter would also create substantial uncertainty as to
    which sovereign has jurisdiction over ceded lands.  Criminal defendants and civil litigants might
21  have a substantial incentive to argue that this reverter had been triggered, leading to uncertainty and
    promoting litigation.  California's statutory scheme, under which jurisdiction changes only on the
22  basis of a formal retrocession and acceptance, is far preferable and avoids this result.  In addition,
    the retrocession of jurisdiction has profound effects on the legitimate interests of the State, county,
23  and city, in that a unilateral retrocession is highly undesirable.  For example, retrocession often
    causes a shifting of the burden to provide various services to the public, e.g., police, schools,
24  libraries, roads, from the federal government to local government.  Obviously, California's detailed
    procedural requirements for retrocession are designed so as to avoid abrupt and surprising shifts in
25  those expensive burdens that might occur, were unilateral retrocession allowed.

26

27

    U.S.A.'s *Amicus Curiae Memo*
28  <u>Swords, etc. v. Kemp</u>, C 05-01661 MJJ     - 8 -

Opening Memo, 11:12-13.  Further, Swords argues that "Section 104(h) also makes plain that, as of the transfer of control to the Presidio Trust, there was no longer any exclusive federal jurisdiction in existence regarding the Presidio lands." Id. 11:16-17.  Once again, Swords draws its own conclusions as to what the legislative body intended, in this case Congress, without citation to any supporting authority, whatsoever, save its own imagination.   And, once again, Swords is completely mistaken.

Contrary to Plaintiff's assertion, 104(h) is not indicative of congressional acknowledgment of any loss of exclusive federal jurisdiction over the Presidio. Id. 11:24-26. In a report submitted to the Senate committee that added the language that eventually became 104(h), the Department of the Interior (DOI) stated:

> To ensure that the Trust has the legal authority to defend itself, we recommend that the Attorney General represent the government in litigation and that the forum for litigation against the Trust should be the District Court for the Northern District of California. **This will limit the venue of lawsuits against the Trust so that these suits may not be brought in the Federal Claims Court or anywhere else in the country.** The Trust would still have the authority to select the venue for its litigation.

(Emphasis added) S. Rep. 104-202, at 26 (1996).  Clearly this language Congress included in Section 104(h) is not "superfluous" to the retention of exclusive federal jurisdiction because without this provision the Trust could potentially be sued in *any* federal district court in the country.  See 28 U.S.C.A. § 1391(e).  Congress *did* have a reason to enact this jurisdictional provision because the agency  "preferred having some control over litigation by allowing suits against the Trust to be filed only in the District Court for the Northern District of California." Donald J. Hellman, The Path of the Presidio Trust Legislation, Golden Gate University Law Review 319, 354-55 (1998).  Nowhere in the legislative history of this provision does Congress, or any agency, indicate any concern that there would be a loss of exclusive

//

U.S.A.'s *Amicus Curiae Memo*
Swords, etc. v. Kemp, C 05-01661 MJJ     - 9 -

1   jurisdiction at the Presidio, upon the Army's transfer of administration, without enactment of

2   Section 104(h).

3           In sum, the limited venue provision on which Swords relies provides no support for the

4   assertion that Congress believed it no longer had exclusive jurisdiction over the Presidio;

5   rather, it simply shows that Congress intended to narrow the federal forums in which a plaintiff

6   could sue the Trust.

7   **C.      The Case Law Supports a Finding That Exclusive Federal Jurisdiction Was
            Never Lost and That It Continues to Apply to All Parts of the Presidio.**

8

9           **1. Swords relies on cases that are easily distinguished.**

10          Swords cites a number of cases that, it argues, supports its position that exclusive

11  federal jurisdiction over the Presidio disappeared upon transfer of administration to the Trust.

12  As discussed below, the holdings in all of those cases are distinguishable on the facts, or

13  otherwise, and none of them provides any credible authority for the proposition urged by

14  Swords.

15          First, Swords quotes a passage from *Fort Leavenworth R. Co. v. Lowe*, 114 U.S. 525, 5

16  S.Ct. 995 (1885), as authority supporting its view of the law applicable in this case.  However,

17  the passage cited by Swords is <u>not</u> the holding of the *Fort Leavenworth* case, and the Kansas

18  cession law involved in that case was completely different from the one in issue here.

19          *Fort Leavenworth* concerned the act of the State of Kansas in levying and collecting

20  property taxes on railroad facilities located on land which was a part of the Fort Leavenworth

21  military reservation.  The railroad sued to recover taxes paid on those facilities to  Kansas on

22  grounds that they were located on land that was under the exclusive jurisdiction of the United

23  States and immune from state tax.   Kansas had granted exclusive jurisdiction to the United

24  States over Fort Leavenworth through a cession act in 1875 which provided, in part, as
    follows:

25              'That exclusive jurisdiction be, and the same is hereby, ceded to the United States
                over and within all the territory owned by the United States, and included within the
26              limits of the United States military reservation known as the 'Fort Leavenworth

27

28  U.S.A.'s *Amicus Curiae Memo*
    <u>Swords, etc. v. Kemp</u>, C 05-01661 MJJ   - 10 -

Reservation' in said state, as declared from time to time by the president of the United States, saving, however, to the said state the right to serve civil or criminal process within said reservation, in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed in said state, but outside of said cession and reservation; and *saving further to said state the right to tax railroad, bridge, and other corporations, their franchises and property, on said reservation'*. (Emphasis added) Laws Kan. 1875, p. 95.

. . .

The question as to the right of the plaintiff to recover back the taxes paid depends upon the validity and effect of the last saving clause in this act.

*Id*. at 528 and 997.

The Supreme Court examined the explicit language in the Kansas cession act and concluded, simply, that a cession law containing such an exception to exclusive jurisdiction of the United States can be utilized to require the railroad to pay the state's taxes on its facilities on Fort Leavenworth, and there is no constitutional prohibition against enforcement of that saving clause.  *Id*. at 542.

The foregoing analysis makes plain that the holding in *Fort Leavenworth* has absolutely no application to the facts before this Court.[5]/  Moreover, it does not support Swords' theory that transfer of the administration of the Presidio from the Army to the Trust caused the United States to lose the exclusive jurisdiction granted it by the 1897 California cession law.  The California cession law does not contain an explicit exclusion or reverter clause, whereas the Kansas cession law at issue in *Fort Leavenworth*, had an explicit exception to the United States exclusive jurisdiction which specifically allowed the state to collect taxes on railroad facilities located on Fort Leavenworth.  Thus, the facts in *Fort Leavenworth* have no commonality with the facts before this Court, and therefore, the holding has no application to this case which would support the position urged by Swords, i.e., that exclusive jurisdiction has retroceded to the State of California.

---

[5]/    The *Fort Leavenworth* case does serve to remind us that legislatures know full well how to  write exceptions and/or conditions to the jurisdiction granted in cession laws they enact. See argument in part "A.," above.

U.S.A.'s *Amicus Curiae Memo*
Swords, etc. v. Kemp, C 05-01661 MJJ   - 11 -

A similar disconnect between the facts and law in this case exists with the next one cited by Swords, *Crook, Horner & Co. v. Old Point Comfort Hotel*, Co., 54 F. 604 (E.D.Va. 1893).  In that case, the cession law of the State of Virginia giving title and jurisdiction to the United States contained a specific reverter clause.

> (2) And be it further enacted, that *should the said United States at any time abandon the said lands and shoal, or appropriate them to any other purpose than those indicated in the preamble to this act, that then, and in that case, the same shall revert to and revest in this commonwealth.*

(Emphasis added) Act of March 1, 1821, quoted by the Court at p. 606.  At issue in *Crook Horner* was land on Fortress Monroe upon which the United States had allowed a privately owned and commercially operated hotel to be erected.  Plaintiff in that case sought to have certain liens on the hotel adjudicated against the hotel company and others, and the Court there had to determine whether the general laws of Virginia had force on the hotel grounds. Because the United States had caused the hotel grounds to be appropriated to purposes other than was set forth in the Virginia cession law, the Court held that the express reverter clause in the cession law caused those lands to revert jurisdictionally to Virginia.  *Id.*, at 611.

Once again, Swords relies upon case authority which bears no relation to the facts before this Court.  Unlike the Virginia cession law examined in *Crook Horner*, the California cession law applicable to the Presidio contains no express reverter clause, whatsoever, and although Swords would like this Court to imply a reverter clause in the Presidio cession law, it has cited no facts or legal authorities which would support that result.  Without doubt, *Crook Horner* does not provide any authority for Swords' interpretation of the Presidio cession law.

A third case cited by Swords in support of its argument that exclusive federal jurisdiction at the Presidio has retroceded, *Palmer v. Barrett*, 162 U.S. 399, 16 S.Ct. 837 (1886), fails for the same reason as the first two.  The New York cession statute in *Palmer* contains an express reverter clause returning jurisdiction to New York whenever the United States ceased use of it for the governmental purposes intended, whereas the California cession

U.S.A.'s *Amicus Curiae* Memo
Swords, etc. v. Kemp, C 05-01661 MJJ    - 12 -

law for the Presidio contains no reverter clause. *Palmer* involved a private party suit for damages for unlawful ouster from possession of two market stands located on lands acquired by the United States for a navy yard and naval hospital.

The Court in *Palmer* found that the New York cession law contained express language calling for reverter of jurisdiction.

> Looking at that act, we find that it was 'for the uses and purposes of a navy yard and naval hospital,' and that it was therein expressly provided 'that the United States *may retain such use and jurisdiction as long as the premises described shall be used for the purposes for which jurisdiction is ceded, and no longer*. * * * Nor shall the jurisdiction so ceded to the United States impede or prevent the service or execution of any legal process, civil or criminal, under the authority of this state.' (Quoted language taken from chapter 355 of the act of June 17, 1853.)

(Emphasis added) Id., at 403. Consequently, because of this express reverter language, the Court found that the case presented "the very contingency contemplated by the act of cession; . . . the exclusion from the jurisdiction of the United States of such portion of the ceded land not used for governmental purposes . . . therein specified." *Id*. at 404.

Examination of the California cession law applicable to the Presidio reveals no similar language. Indeed, it reveals no language whatsoever calling for either reverter of title or retrocession of jurisdiction when administration of the Presidio passed from one governmental entity to other such entities, e.g., from the Army to the DOI and the Trust. Therefore, like the other cases cited, *Palmer* provides no authority supporting the retrocession of exclusive jurisdiction to California, as suggested by Swords.

*S.R.A., Inc. v. State of Minnesota*, 327 U.S. 558, 66 S.Ct. 749 (1946), is yet another case cited by Swords which involves facts bearing no similarity to those concerning the Presidio. In *S.R.A*, land held by and under the exclusive jurisdiction of the United States was purchased on public sale by S.R.A., Inc. The Court treated "the government's unrestricted transfer of property to non-federal hands [as] a relinquishment of the exclusive legislative power." Id. at 564. The problem with that case for Swords is that the United States has made no transfer, whatsoever of the ownership of the Presidio property, let alone a transfer to "non-

1  federal hands," in the instant case.  The United States still owns the Presidio.  Only the

2  administration of the Presidio was transferred to the Trust and DOI, both of which are United

3  States government entities, not to a non-federal party, as was the case in *S.R.A.*  Because of

4  these strikingly dissimilar facts, the *S.R.A.* case provides no precedent for this Court to find

5  that the United States retroceded exclusive jurisdiction at the Presidio.

6       Finally, the last case cited by Swords on this subject, *United States v. Goings*, 504 F.2d

7  809 (8th Cir. 1974), concerns facts almost identical to *S.R.A.* in that the United States conveyed

8  a portion of land it had held under exclusive federal jurisdiction to a private corporation.  The

9  issue presented was whether the United States retained exclusive jurisdiction over that portion

10  of the land after it transferred the acreage by quitclaim deed to the private corporation.  As in

11  *S.R.A.* and other similar cases where the United States transferred its ownership interest in the

12  land, the Court in *Goings* held that the United States had divested itself of exclusive

13  jurisdiction.

14       Once again, Swords relies on another case, *Goings*, as authority for something not in

15  issue in the instant case because the United States has *not* transferred any part of the Presidio to

16  private ownership.  Rather, the administration of the Presidio has passed from one federal

17  entity to two other federal entities, i.e., from the Army to the Trust and DOI.   The holding in

18  *Goings* says absolutely nothing about a transfer of administrative control among federal

19  entities.  Accordingly, it has no application and constitutes no authority supporting Swords'

20  contention that the United States has lost its exclusive jurisdiction over the Presidio

21      **2. Transfer of Administrative Control to the Department of Interior and Trust**
   **Did Not Alter the Existing Exclusive Federal Jurisdiction at the Presidio.**

22

23       Nothing has happened since the 1897 cession statute that would alter the exclusive

   federal jurisdiction over the Presidio.  The courts have routinely observed the terms of the
24
   1897 statute in all respects.   The district court in *Watkins,* 22 F.2d 437, held it was clear that
25
   the Presidio was under the exclusive jurisdiction of the United States. *Id.* at 440; *see also*
26
   *Consolidated Milk Producers for San Francisco v. Parker*, 19 Cal. 2d 815, 816 (1942) (State
27

28   U.S.A.'s *Amicus Curiae* Memo
   Swords, etc. v. Kemp, C 05-01661 MJJ   - 14 -

Director of Agriculture had no jurisdiction to establish minimum prices for milk sold to military agencies of United States in the Presidio) ("California ceded exclusive jurisdiction over the Presidio to the United States by the Act of March 2, 1897 (Cal. Stats. 1897, page 51) reserving only the right to execute civil and criminal processes therein"). The Supreme Court agreed. *Standard Oil*, 291 U.S. at 244 (California having ceded exclusive legislative jurisdiction over the Presidio to United States, California legislature could not impose a tax on sales and deliveries of gasoline occurring therein) ("it seems plain that by the act of 1897 California surrendered every possible claim of right to exercise legislative authority within the Presidio – put that area beyond the field of operation of her laws"). No subsequent state or federal decisions identify any legislation, state or federal, that would have effected a change in the Presidio's status as a federal enclave. Indeed, the Courts of this District have routinely recognized and applied exclusive federal jurisdiction to cases arising on the Presidio. See *Volk v. United States*, 57 F.Supp.2d 888, 893, n. 1 and n. 2.

Relying on dictum in *Fort Leavenworth R. Co. v. Lowe*, 114 U.S. 525, 541-42 (1885), Swords has argued that all cession of land by a state is "necessarily temporary, to be exercised only so long as the places continue to be used for the public purposes for which the property was acquired or reserved from sale." But this dictum is not supported by the terms of the 1897 cession itself. In describing acts of cession and acceptance as "declarations of the agreements, reached by the respective sovereignties, State and Nation, as to the future jurisdiction and rights of each," the Supreme Court has recognized that

> [t]he States of the Union and the National Government may make mutually satisfactory arrangements as to jurisdiction of territory within their borders . . . . Jurisdiction obtained by consent or cession may be qualified by agreement or through offer and acceptance or ratification. It is a matter of arrangement. These arrangements the courts will recognize and respect.

*Collins v. Yosemite Park Co.*, 304 U.S. 518, 528 (1938). Given the contractual nature of these

//

U.S.A.'s *Amicus Curiae Memo*
Swords, etc. v. Kemp, C 05-01661 MJJ   - 15 -

1   arrangements, the Court should not render decisions altering them when neither of the

2   contracting parties are parties in the suit.

3          Nor does subsequent Supreme Court authority support Swords' position.  On the

4   contrary, in *Humble Pipe Line Co. v. W. E. Waggoner*, 376 U.S. 369, 372-73 (1964), the

5   Court held that, in leasing to private parties the right to exploit portions of a military base for

6   oil and gas drilling, the federal government did *not* thereby surrender exclusive jurisdiction

7   over the land.[6]/  The Court's reasoning was that the federal government had not sold the land,

8   but rather continued to hold it "subject to its primary jurisdiction and control."  *Id.*  The same

9   is true here, as the federal government continues to own, control, and administer the Presidio -

10  -- it has merely transferred administrative jurisdiction from one federal instrumentality (the

11  Army) to two other such instrumentalities (the Trust and DOI).  More is needed to

12  demonstrate surrender of exclusive jurisdiction.  "[I]n order for Congress to subject a federal

13  enclave to state jurisdiction, there must be a specific congressional deferral to state authority

14  over federal property."  *West River Elec. Ass'n v. Black Hills Power and Light Co.*, 918 F.2d

15  713, 719 (8th Cir. 1990). Clearly, there has been no specific congressional action deferring to

16  California authority over the Presidio.  Therefore, the United States continues to have and

17  exercise exclusive jurisdiction over all parts of the Presidio.

18  **D.     Cases Concerning Indian Trust Lands Have No Application to Federal Enclave
         Jurisdiction.**

19

20         Swords' attempted analogy between federal enclave jurisdiction and federal

21  jurisdiction retained by 28 U.S.C. 1360(b) is spurious at best.  As noted by the Supreme

22  Court, the purpose of 28 U.S.C. §1360(a) was to grant state courts jurisdiction over civil

23  issues on reservations in order to "redress the lack of Indian forums for resolving private legal

24  disputes between reservation Indians, and between Indians and other private citizens."  *Bryan*

25  _____

26  [6]/    Similarly here, where the Trust merely leased two buildings on the Presidio to
    Swords, the United States did *not* thereby surrendered exclusive jurisdiction over the

27  property.

28  U.S.A.'s *Amicus Curiae* Memo
    Swords, etc. v. Kemp, C 05-01661 MJJ   - 16 -

1  *v. Itasca County*, 426 U.S. 373, 384 (1976).  Contrary to Swords' assertion, §1360(b) was not

2  meant to be anything like an affirmative grant of federal exclusive jurisdiction; rather, it was a

3  statement of Congress's intent to "reaffirm[] . . . the existing reservation Indian-Federal

4  Government relationship in all respects save the conferral of state-court jurisdiction to

5  adjudicate private civil causes of action involving Indians."  Id. at 391.  Consequently, with

6  respect to Indian trust lands, §1360(b) merely retained the complex and distinctive body of

7  law governing the relationship between the Indians, states and the federal government that

8  existed before, at the time, and after §1360(b) was enacted.  Id. at 391-92.

9         In addition to the Court's outright rejection of an analogy similar to that urged by

10 Swords, the foregoing is but one example showing that the law applicable to Indian country is

11 entirely distinct and unhelpful in answering the question presented here.   Indeed, the courts

12 have dismissed any analogy between cases involving federal enclaves and cases involving

13 Indian lands, considering that body of law a red herring insofar as non-Indian federal lands are

14 concerned.  *City of Roseville v. Norton*, 219 F.Supp. 2d 130, 150-151     (D.D.C. 2002).  See

15 also  *Carcieri v. Norton*, 290 F. Supp. 2d 167, 188 (D.R.I. 2003).

16        The often complex body of Indian law retained by §1360(b) has no relationship to the

17 settled federal enclave jurisprudence.  As just one example, there are distinctive rules

18 governing the circumstances in which a State may tax activities on an Indian reservation.  *See*

19 *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 175 (1989); *see also* Bryan 426 U.S. at

20 392 n.16 ("Congress would have been fully justified in 1953 [which was when §1360(b) was

21 passed] in being uncertain as to state power to levy a personal property tax on reservation

22 Indians.").  This is in stark contrast to the unquestioned prohibition of state taxes on activities

23 within a federal enclave.  *Standard Oil Co. v. California*, 291 U.S. 242, 244 (1934) (holding

24 California could not levy a tax on sales of petroleum within the Presidio federal enclave).  Of

25 course this one example should not suggest that the complexity in Indian jurisprudence is

26 //

27

28  U.S.A.'s *Amicus Curiae Memo*
    Swords, etc. v. Kemp, C 05-01661 MJJ   - 17 -

1  limited only to the state's power to tax; the complexity extends to all aspects of Indian

2  sovereignty.

3         In this nuanced division of sovereign authority between the federal government, States

4  and Tribes, Swords' claims to have found a small island of support for the proposition that

5  "disputes between private parties present no federal question,"  Swords' Supp. Brief at 4.  Not

6  surprisingly, even this proposition has been subject to contradictory applications in the

7  California courts.  Compare *All Mission Indian Housing Authority v. Silvas*, 680 F.Supp. 330

8  (C.D.Cal 1987) with *Round Valley Indian Housing Authority v. Hunter*, 907 F.Supp. 1343

9  (N.D.Cal. 1995).  In any event, to the extent that there is case law suggesting that individual

10 disputes should be left to tribal and state courts, that principle is based on considerations of

11 whether individual disputes implicate the "strong interest in tribal rights to Indian lands."

12 *Gila River Indian Community v. Henningson, Durham, and Richardson*, 626 F.2d 708, 715

13 (9th Cir. 1980).  Regardless, it's clear that the complex body of law dealing with Indian

14 country provides no authority for deciding the question presented in this case.

15        This distinctive analysis is wholly inapplicable to cases implicating the Federal

16 Government's right to exclusive jurisdiction over ceded lands.  *Standard Oil*, 291 U.S. at 244.

17 The Court should not accept Sword's invitation to introduce complexity into the stable body

18 of federal enclave law by referencing the wholly unrelated and *sui generis* rules governing

19 jurisdiction in Indian Country.

20                                    **CONCLUSION**

21        For all the foregoing reasons, should this Court find it necessary to consider the

22 question of federal exclusive jurisdiction over the Presidio, the Court should find that the

23 United States continues to exercise exclusive jurisdiction over the Presidio, and it should

24 //

25 //

26 //

27

28  U.S.A.'s *Amicus Curiae Memo*
    Swords, etc. v. Kemp, C 05-01661 MJJ   - 18 -

1  avoid relying on the alleged loss of such federal jurisdiction as a grounds for deciding

2  Swords' motion for remand.

3                                       Respectfully submitted,

4                                       KEVIN V. RYAN
                                        United States Attorney

5                                                /s/

6

7                                       CHARLES M. O'CONNOR
                                        Assistant United States Attorney

8                                            Attorneys for *Amicus curiae*

9
   OF COUNSEL:
10 Karen Cook
   General Counsel
11 Presidio Trust

12 Alfred Rosen
   Assistant General Counsel
13 Presidio Trust

14 Barbara Goodyear
   Field Solicitor
15 U.S. Department of Interior

16

17

18

19

20

21

22

23

24

25

26

27
   U.S.A.'s *Amicus Curiae Memo*
28 Swords, etc. v. Kemp, C 05-01661 MJJ   - 19 -

1

## TABLE OF CONTENTS

2

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

INTEREST OF THE UNITED STATES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

   A.  Swords' Arguments Regarding the Loss of Exclusive Federal Jurisdiction are
      Unsupported by Facts or Law.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

   B.  Swords Misconstrues the Authorizing Legislation for the Trust and Infers a
      Totally   Erroneous Congressional Intent in an Attempt to Support Its
      Theory. . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . .. . .. . . . .. . . . . . . . . .8

   C.  The Case Law Supports a Finding That Exclusive Federal Jurisdiction Was
      Never Lost and That It Continues to Apply to All Parts of the Presidio. . . . . . . 10

     1.  Swords relies on cases that are easily distinguished. . . . . . . . . . . . . . . . . . . .10

     2. Transfer of Administrative Control to the Department of Interior and Trust
      Did Not Alter the Existing Exclusive Federal Jurisdiction at the Presidio. . . .14

   D.  Cases Concerning Indian Trust Lands Have No Application to Federal Enclave
      Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

U.S.A.'s *Amicus Curiae Memo*
<u>Swords, etc. v. Kemp</u>, C 05-01661 MJJ      i

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES

3   All Mission Indian Housing Authority v. Silvas,
        680 F. Supp. 330 (C.D.Cal 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

4

    Bryan  v. Itasca County,
5       426 U.S. 373 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

6   Carcieri v. Norton,
        290 F. Supp. 2d 167 (D.R.I. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

7

    City of Roseville v. Norton,
8       219 F. Supp. 2d 130 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

9   Collins v. Yosemite Park Co.,
        304 U.S. 518 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

10

    Cotton Petroleum Corp. v. New Mexico,
11      490 U.S. 163 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

12  Fort Leavenworth R. Co. v. Lowe,
        114 U.S. 525, 5 S. Ct. 995 (1885) . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 14

13

14  Gila River Indian Community v. Henningson, Durham, and Richardson,
        626 F.2d 708 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

15  Humble Pipe Line Co. v. W. E. Waggoner,
        376 U.S. 369 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

16

    Palmer v. Barrett,
17      162 U.S. 399, 16 S. Ct. 837 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

18  Round Valley Indian Housing Authority v. Hunter,
        907 F. Supp. 1343 (N.D.Cal. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

19

    S.R.A., Inc. v. State of Minnesota,
20      327 U.S. 558, 66 S. Ct. 749 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

21  Standard Oil Co. v. California,
        291 U.S. 242 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14, 6, 17

22

    Swords, Crook, Horner & Co. v. Old Point Comfort Hotel, Co.,
23      54 F. 604 (E.D.Va. 1893) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

24  United States v. Bateman,
        34 F. 86 (C.C.N.D.Cal. 1888) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

25

    United States v. Goings,
26      504 F.2d 809 (8th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

27  United States v. Watkins,
        22 F. 437 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 13

28

United States v. Watkins,
    22 F.3d 437 (N.D.Cal. 1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Volk v. United States,
    57 F. Supp. 2d 888 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

West River Electric Association v. Black Hills Power and Light Co.,
    918 F.2d 713 (8th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**STATE CASES**

Behlow v. Southern Pacific Railroad,
    130 Cal. 16 (1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Beran v. Harris,
    91 C.A.2d 562 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Consolidated Milk Producers for San Francisco v. Parker,
    19 Cal. 2d 815 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Cullen v. J.C. Sprigg,
    83 Cal. 56 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**FEDERAL AUTHORITIES**

16 U.S.C. § 460bb Appendix (as amended)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8, 9

28 U.S.C. 1360(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

28 U.S.C. § 1391(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

S. Rep. 104-202, at 26 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

U.S. Const. art. I, §8, cl.17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**STATE STATUTES**

Cal. Gov't Code § 113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Cal. Civil Code section 1442 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Cal. Stat. 1897, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6